We'll call the next case. Elsmere Park Club v. Townof Elsmere Mr. Regal and Mr. McNally I will do a little height adjustment. Good afternoon, Your Honor. It's David Eagle. May it please the court that the firm of Claire Harrison and Longington, Delaware, on behalf of Elsmere Park Club, the owner of the apartment community in Elsmere, Delaware, is condemned in all the tenants evicted in October of 2002. This all started on what day, October 4th or when? Correct, Your Honor, October 4th. And you went to chancellery court when, October 10th? That's correct, Your Honor. I think we filed our motion for TRO on October 9th and Vice Chancellor Lamb was kind enough to provide us with a hearing the next day. By the 10th, there were 39 units? There were 39 buildings in total. 38 were condemned. And the other was just sort of the office? Correct. But it actually was the same structure and the same location, which is, I think, an important fact. And by the 10th, how many had been condemned? I believe it was approximately 30 a day, excuse me, 10 a day, pardon me. And Friday the 4th, two had been condemned already. That was 1405 and 1421? Correct. And then Monday, Tuesday, Wednesday, virtually all of the buildings, as I recall, had been condemned by the time of the TRO hearing. I think there may have been a handful left. And my colleague and I went in to try to halt the continued condemnation and eviction without having had access to the premises at that point. And what was the basis of the Vice Chancellor's decision? Well, as I recall, I mean, we simply did not have a substantial enough record to show irreparable harm and to show the likelihood of success under the injunction standard that given the only evidence, real evidence, besides some testimony at the TRO hearing were photographs. And some of them are admittedly pretty bad. There are photographs of basements where there were no people living. That's what the Vice Chancellor had to work with. And we, the apartment owners, were not allowed access. And those buildings, no people were living in the basement. Were there anybody in the second floor in those buildings? Yes. I believe there were three floors, four upper apartments inhabited, and then you have the two basement apartments that were closed off since 1989. Well, no, I'm sorry. There was flooding in 1989. They were closed off a few years later. But the claim being that mold had kind of festered there for 13 years, that was the claim that's made by the town throughout the record. However, there were no complaints of medical conditions or ailments relating to mold after the fact, Your Honor. Six of the basements had no visible mold, according to EPC zone experts, which examined the premises right now. What kind of mold was detected, by the way? Excuse me? What kind of mold was detected? There's various kinds. That I cannot answer, Your Honor. I mean, there was some visible mold on the walls. There's black areas. I mean, some molds are non-toxic. Some you don't want to be near. Right, right. As I understand it, and I'm sure my good friend on the other side of the aisle will correct me if I'm wrong, that there was not any of the notorious or infamous type of mold. Putting that aside, Your Honors, at the time and today, there is no consensus about the effects of mold in an indoor area, according to the Center for Disease Control, according to the New York City guidelines, which were widely filed and which were incorporated into the Notice of Condemnation of the town, which says that a building-wide evacuation is not indicated unless, even during remediation, and that's generally when you want to evacuate people, when the mold is flying around or could potentially get into contact with people, that's not even indicated unless it's linked to physical illness for sensitive populations. So is your ultimate claim here, are you challenging the emergency procedure that was in place, or are you challenging the way that the emergency procedure in place was carried out here? Both, Your Honor. Initially, initially, there was no one where we contend, it represented there was no emergency, given the type of potential issue with mold in basement apartments that were not inhabited by people, that there was no legitimate emergency that would make this case represent the truly unusual and extraordinary case under due process precedent that would alleviate the need for a factual hearing. A factual hearing could have been done in two or three days, and then further to answer your question, Your Honor, that the way in which the emergency condemnation or perceived emergency, as the town argues, was carried out could have been done clearly in a less drastic manner. Mr. Eagle, don't you, in effect, to prevail here, have to show that in light of the inspections, the evidence that they had, and the code violations that they cited, that the conduct of the local officials was in bad faith? I don't believe that's necessary, Your Honor. I don't believe that's necessary. If you look, if we do follow the putt, if you will, of the Second Circuit and the Sixth Circuit in Cantazzaro and Harris, respectively, wouldn't, isn't Judge Fisher's question right on? In other words, in hindsight, you could pick fault with it, but here's what they believed, and they did it in good faith. Your Honor, I think those cases, Cantazzaro and that line of cases, clearly show that the town officials cannot simply put blinders on and rely on a state official. It puts the state official in a very awkward position, because without enough information, then there is this obvious, what state official and what town official? You'd be turning the tables on governmental actions all across this country if you said that the local officials could not blindly follow state officials. I mean, there are a lot of local officials who like to tell the state officials to get lost, but once the state officials show up and say something, there aren't too many local officials who are going to take action contrary to what they find. Especially if it's getting publicity. Understood, understood and agreed. Now, the only point I would make is that it cannot be without objective standards. I believe, I call it Cantazzaro, the second certain case... You pronounced it correctly, I didn't. Clearly states that there has to be competent evidence, there has to be objectively reasonable standards that the town official is guided by. And this case really illustrates why that's important. Because after the events in question, Dr. Llewellyn, the state official, that was the source of the reliance, he acknowledged that very common procedures are used in asbestos or mold remediation, encapsulated plastic sheeting, negative pressure, the heat of filter vacuums, would have been possible in this case. It would have been possible. And it would have, yeah, it would have been convenience people, there would have had to be some dislocation, it would have been expensive. He says, he does say that. But he does say that it would have been possible. So when he had no information at his disposal, in fact, the first two condemnations in this case took place on Friday, October 4th, over the phone with Dr. Llewellyn. He hadn't even been there yet, the record reflects. And when you don't have information, I would submit that the safe course is to err on the side of closing down the apartments. That creates a constitutional issue because that creates an undue risk of a wrongful deprivation. But what the Second Circuit has said is that, quote, if an official believes that the public is in immediate danger, he or she should not hesitate to invoke an emergency procedure for fear of being sued and being held liable for damages should his or her decision later prove to be incorrect in hindsight. Now, so, let's assume for the moment that, yes, there was things that could have been done that weren't, you can pick holes in it, but they believed, after consulting with the state, that there was a serious problem that needed to be dealt with immediately. In that context, in effect, they're saying there's a public policy that we're not going to be too tough on them, especially when there's a post-deprivation procedure, which we'll talk about. Right, I understand that, Your Honor. However, I think we have to make a distinction between mold and the line of, excuse me, emergency cases. Well, there was a lot more that was part of the problem besides mold. Wasn't that right? In the basements. I think the town, in all fairness, was kind of alerting the notice of condemnation with some other very graphic... I mean, some of the pictures were pretty graphic. Understood, understood. Now, I think the driving force behind the condemnation was clearly mold. I mean, there were 39 buildings, as we started off discussing, or 38 that were ultimately condemned, and I don't believe those other issues of unsanitary conditions were present in more than a handful of the buildings. I think the record will reflect that. But going back to Your Honor's question, that there's a line of cases, and those cases, even Catanzaro talks about a car crashing into a building and the code enforcement officer is watching it crumbling before his eyes. Well, with every minute, with every minute that passes, he or she has to be responsible for people whose lives are at risk. There's a Third Circuit case that the town cites where there was a building that had unvented space heaters hooked up to gas lines, and they had to be shut down, and there was no heat. Well, no heat in a building during the wintertime in North and Western Pennsylvania is a lot different than mold, which there is no scientific consensus as to the dangers that they pose, even to sensitive populations. Look at the less drastic measures that could have been taken. Ask the apartment owner to pay for hotel stays for babies and other sensitive populations. Many options could have been used. Well, I'll give you a couple more minutes here. Why don't you address what your problems are with the post-deprivation process here? Thank you, Your Honor, and I will be brief. I did neglect to say at the outset that I had asked to reserve three minutes of rebuttal time. And I neglected to ask, so we'll give you three minutes. Thank you. Once we get over the emergency issue and we agree with the district court, who found that there was a due process violation of pre-deprivation, she nonetheless continued to discuss the post-deprivation remedy. And I think that's an extremely important point. If the court is inclined to go there, which I think was, respectfully, was error, to go into the post-deprivation administrative remedy once there's been a finding of a due process violation, that we take issue with that. But what the provisions, the code said that you could go  if there was a due process violation. Is that correct? Correct. But all they really had in place was the board of adjustment. Is that correct? Well, we later found that out. There was no board of building appeals, period. But the same, they would have been identical anyway. Identical membership, the same number of people, same person on one would have been on the other. So the negotiation process My guess is their exemplar was the BOCA code. Excuse me? My guess is their exemplar was the BOCA code. That's correct. That's correct. And I note that the board of building appeals and the BOCA code has its own qualifications for members. I don't believe those are relevant to a zoning type of board. And the zoning procedure had its own, excuse me, the board of adjustment had its own procedures. This was a condemnation issue. That's correct. But no citizen would be able to find that out unless they had ferreted out these statutes, had engaged in the process and discovered that there were no procedures. Well, but you had even, whether it was you or not, but your client had, they had discussions with the municipal local government attorney. And in fact, you went so far as to enter into an agreement to stay your rights and that's correct. So I think you under, at that point, there's an indication that you understood what the procedures are. I think at that point, your honor, my client understood that nothing was going to be happening quickly. There were no expedited procedures and tenants had left, had entered into new contractual relationships. They were not going to be coming back to an apartment community that the town had tagged as being toxic. And, you know, and there were no, and there were no established procedures. Well, it's bad, but somehow you got somebody to pay three point whatever million for it, which is somewhat surprising if it was as bad as depicted. Well, I mean, I think that's a fair point. My point is, you abandoned the administrative, you abandoned the appeal, you abandoned the process. No question that, that my client began the process, realized that there was no Board of Billing Appeals, realized there was only a Board of Adjustment, which had its own procedures, which were counter to an expedited treatment of its issue and realized after October 14th, which I think is in the record, that there were, that all the tenants realized that it was, it was not going to have a productive day in court as it were with the administrative appeal. You're not suggesting, are you, that if the Board had overruled the town code official who ordered the evictions that that ruling would have been of no effect? I think it would have been, it would have had effect. The town would have been bound by the decision of the Board if it had been in your favor and it overruled the eviction order of the code enforcement officer. Yes, I think it would have had effect. It wasn't a futile proceeding. It wasn't a nullity whether the Board had the right name or apt procedures or not. Well, I'm hesitating a little bit because it may have had effect internally in the town of Ellesmere, but it also could have been subject to attack collaterally by others who wish to undo the ruling of a Board of Adjustment as being ultra vires or otherwise not competent to deal with that issue. And I think it would have left the apartment owner on very shaky ground to have to go back to running its buildings and not ever really be sure that someone might come along and say you've been allowed back in, but there was no Board of Building Appeals, there was a patchwork that was necessarily futile and I don't hear you saying it was necessarily too slow. It sounds like what you're really saying is as a practical matter it wasn't worthwhile because the tenants were all gone and weren't coming back. Well, I don't think I made myself clear because I wouldn't say that that is futility. That is part of futility that the tenants at that point had left, had signed leases with other apartments and believed that the process was too slow. How long were you in the process before you abandoned it? From filing until abandonment? A few weeks, November to December, November to sometime possibly through December when we, I mean actively pursued it just for a few, I think it was just for several days where we discovered from the town solicitor that they were proposing this procedure or they were proposing that procedure and we counted with our own iterative process and there you have it, the procedures were being made up on the fly. Thank you. Thank you very much. Thank you very much, Mr. McNally. May it please the court, I'm Edward McNally. I am the town solicitor for the town of Bellsmere and represent all the appellees in this case. Was it ever determined what kind of mold there was? Yes, it was Judge Ambrose and I'm embarrassed to say I cannot remember standing here today what it was. Was it determined by those who looked at it to be of a serious kind that could be toxic? Absolutely. The mold was tested and the test results are somewhere in the record. Dr. Llewellyn repeatedly testified that this particular mold which he had seen was a dangerous mold. He testified to that effect before Vice Chancellor Lamb who asked him that specific question and got that specific answer. In fact he gave the Vice Chancellor a series of questions that got answers he didn't like and that was the end of that. If mold is in a basement does it necessarily travel to the upstairs apartments in those buildings? Forgetting the other buildings for a moment. They didn't find mold in every single basement did they? They found mold as I understand the record in every single basement of the toxic variety. Some of the basements did not have the same level of mold as depicted in some of the photographs but it's important to note that the two most serious basements were the ones that Dr. Llewellyn did not personally see but all the others he did. Those were 1405 and 1421 and those were closed immediately weren't they on the 4th? Yes sir but Dr. Llewellyn said they were not conducted prior to the condemnation that's correct they were conducted thereafter not by the town but by the expert and by the state. Your Honor when I respond to your question I want to point out that Dr. Llewellyn said that and this was found by the district court on page I think around 19 of its opinion Llewellyn advised that and that mold spores probably migrated. None of these old apartment buildings were But the way to confirm that would have been done an air sample. You would think again in hindsight looking at all the folks that were called out and publicity there was as I recall there was publicity on this when the thing first hit on the 4th air sample testing. I guess there's always a different way to do things and the state did not advise the town to do it that way because Dr. Llewellyn was satisfied from his inspection of the buildings and his two colleagues were satisfied from their inspection of the buildings and the extensive mold found in the basements that migration of that mold had occurred. Because if you look at some of the photographs there are holes in the floor of the first four apartments in the basement. So did they inspect the upstairs apartments? Did they inspect the upstairs apartments? Dr. Llewellyn did not inspect the upstairs apartments at the time of the condemnation. What provision by the way, under what provision did you condemn the apartments? What provision? Of the town in other words was it the building code or the I'm looking at 108 there's a building code provision 108.1.3 which governs normal condemnation which is on appendix 171 or building code provision 109.0 which governs emergency procedures. Off the top of my head I don't recall which one is cited in our brief but it's certainly the one that provides for emergency conditions. It looked to me like it was under 108 which is not emergency and not 109 which is emergency. In other words one could make an argument from Mr. Eagle's perspective that even if we were to follow Catanzaro or Harris and say that you won't be terribly picky in hindsight if people in good faith believe that there was an emergency it doesn't appear that from what I can see that you went under the emergency provision of 109. Well we did use the emergency provision I don't remember the precise citation but it's in our brief and there's no dispute it has never been argued in the court below that we didn't apply excuse me apply the proper provision of the zoning code to warrant a declaration of an emergency. It's also in the condemnation notices which are of course part of the record. There's just no dispute about that. You might want to take a look at that but it looked like the condemnation notices were referring to 108. 1. 3. Whatever they refer to there's never been an argument made in the district court that we cited the wrong provision of the BOCA code and we relied on some incorrect provision in that code to declare an emergency. The provision in the BOCA code is cited in the district court's opinion. It specifically says that when the property is deemed to be uninhabitable you may declare an emergency. That's the provision we relied upon. No one has ever argued we cited the wrong provision in that perspective. So if that was a good argument it would certainly have been waived in the district court. Q Is it the case that the type of mold and the degree of danger it posed was ascertained by the state toxicology officials prior to the town ordering the evictions? A Yes and no. The first two apartment buildings were condemned based upon an inspection by one of the state officials, not Dr. Wellen, who it is true called in the results to Dr. Wellen who then advised him.   all condemned right away. They filed an application. Blomquist was posting the properties. The first two buildings were condemned based upon an inspection by one of the state officials. Thereafter they filed a TRO application. The town was advised to stop and let the court of chancery have its hearing. And thereafter, after Dr. Wellen had done the actual inspections, then the heavy balance, probably more than 30 of the apartment buildings were then condemned after that. Q So then most of the buildings were condemned after the type of mold had been installed? A I thought that, by the way, at the hearing, just maybe you can clarify this for me, I thought it was roughly about 20 had been condemned as of October 10, the day of the hearing before Vice Chancellor Lamb, and roughly 18 or so were condemned thereafter. Q You know, Your Honor, I would have to count them based upon the condemnation notices which are in the record. I'm sorry, I  you, what was the date of the very first indication that you had a problem? A The very first indication we had a problem of some sort would have been when Blomquist inspected the apartments for purposes of having new tenants move in and detected a strong odor. That would have been approximately the Wednesday before which would have been around say the 6th or the 7th. October 4th is what I meant to say. That's correct. They did not know that there was mold of an extent that they ultimately discovered until they actually inspected the, there was no dispute about this on that Friday. They discovered that. They had a meeting Saturday where everyone was invited to attend. The apartment complex had a representative there whose testimony is that they had to be deaf and blind to ignore this problem. Thereafter they filed a TRO application. My friend says they didn't have access to the buildings and therefore couldn't make their case before the vice chancellor. In fact as the record shows they took photographs and presented them to the vice chancellor. The vice chancellor was extremely critical of the photographs they had used. They did have access. Why was there not a pre-deprivation hearing before you started condemning the let's say 1405 and 1421 you believe you just had to close them down on the fourth. But before you closed down any more why didn't you have a pre-deprivation hearing? Because we were advised it was an emergency situation. Condemnation had to be done immediately. What was the danger? You say the state toxicologist determined that the particular types of mold found in many or all of the basements was a dangerous mold. But dangerous because it caused what condition or disease? It's dangerous because in the basement  mold.        a mold. So the condition of the mold was the dangerous mold. The condition of the mold was the dangerous mold. The answer to that is I am not  of any such complaints to the town of Ellesmere prior to the inspection. And the reason that Bloomquist went there was purely because a new tenant was taking occupancy of some particular apartment? Correct, under the code of the town of Ellesmere every time an apartment building is re-rented to a new tenant the apartment itself must be inspected. Mr. Bloomquist, there is a dispute in the record as to whether he ever saw the basements. Of course he says and this is on page B3 of the supplemental inspection appendix he never saw any of the basements and they were boarded up so how would he have seen them anyway? But before every apartment itself in the unit is re-rented the result is they have to have an inspection. He went and inspected and the place of    not as good as it should have been. The district court found that there was extensive mold growth and other code violations. The district court found that the code officers understood that it was not possible to permit remediation while the buildings were still occupied and the district court found that the photographs evidenced a variety of code violations. My colleague says that the testimony of Dr. Wellen is to the effect that there could have been remediation while people were there. I urge you to read the record in that respect because what Dr. Wellen said is I do not think that there was something short of evacuation that could be done at Ellesmere. And what page of the appendix are you? A1084C to A1084D. And the balance of his affidavit and his testimony before the vice chancellor and the rest of his deposition are entirely consistent with that. Now the district court determined that you  not have the pre deprivation hearing. Now you were happy with that determination but is that a correct statement of the law if I stated it correctly? You have correctly stated what the district court found. We do not question that they did. The rest of what you said is also certainly true. The court found the post deprivation process had a provision for a stay which they never saw it was adequate under the statute. There's a lot of avoidance of the record about what happened with respect to this post deprivation process. It's clear that they proceeded to take an appeal and took it to the board of appeals. They were immediately advised that that was a misnomer. There was the board of adjustment. The statute and the state statute and the code provide that the board of adjustment may hear any grievance against any order entered. There is no qualification on that. It's not just a misnomer. The practice and the statute are consistent that any order entered by a code enforcement officer may be appealed to the board of adjustment. They then found out and asked who's on the board of adjustment. They found that out. Next thing you know they don't want to go forward with that. They stipulate that they are not going to proceed down that path. It's a classic case. They didn't like the judge they had so they went someplace else. They had the right, it's in the statute, that they could have sought a stay and they could have sought a stay from a court. Under the statute there was no time because everybody was moving out. They also argued that the amount of remediation was lost. Those are inconsistent arguments that we think or share the inconsistency in their position. I see that my time is up. Thank you very much. Mr. Eagle. I'd like to circle back to what we began the discussion on which was about good faith. We also made this argument in our briefs and we think the record supports that even if we are, your honors would assume, would conclude rather that there is deference to the town official. Unless there's a showing of good faith there's enough in the record to establish that. What we have here is that the owner was told prior to the condemnation of the two buildings on Friday, October 4th, by someone at the town hall who worked for the town manager, that there was deadly mold throughout the buildings. There was going to be a sweep of every single building. This was prior to inspections, certainly prior to the comprehensive inspections that took place the next week. How does any of this show bad faith? It sounds like Blomquist when he goes in on the second or third with prospective tenants got very worried, called some people in, eventually they thought, boy, they better call the state. And they're quite concerned. And things, you know, over the weekend and whatnot, they're moving very quickly. I don't see any evidence in the record of bad faith. The reason it shows bad faith, Your Honor, is that despite the claim that there was no  there was no     the state   And that's what the state was saying. And that's what the state was saying. And that's what     That's what the state was saying.   the scope of the mold. And that's the scope of the mold. And that's the scope of the mold. That's the scope of the mold. The truth  that       that's what the state was saying. Dan. D. D. Dan. D.